IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| E.D.,[1] | : |
|           Plaintiff, | : |
| | : |
|     v. | :   Civil Action No. |
| | : |
| UNITED STATES OF AMERICA, | : |
| | : |
|           Defendant, | : |
| | : |

**COMPLAINT**

Plaintiff E.D. was an immigration detainee at the Berks County Residential Center-Immigration Family Center ("BCRC-IFC"), when she became a victim of institutionalized sexual assault by Daniel Sharkey, a BCRC-IFC staff member who was responsible for her custody and care while she was detained. The Berks County Resident Center-Immigration Family Center has a contract with the U.S. Immigration and Customs Enforcement ("ICE") agency as a detention facility that houses immigration detainees and their children. This action arises under the Federal Tort Claims Act for the negligence by agents of the United States who failed in their duties to protect E.D. from institutional sexual assault and prevent further harm to her after she reported it.

**I.      JURISDICTION AND VENUE**

1.      This Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and § 1343.

---

[1] Plaintiff's full name is abbreviated to her initials for privacy concerns.

1

2. This Court also has jurisdiction pursuant to the Federal Torts Claims Act, 28 U.S.C. § 1346 and § 2671, et seq.

3. Plaintiff's claims are authorized by 28 U.S.C. § 2201 and § 2202.

4. Venue is proper in the United States District Court for the Eastern District of Pennsylvania under 28 U.S.C. § 1402(b) because the events giving rise to this action occurred within the Eastern District of Pennsylvania.

## II.   PARTIES

5. Plaintiff, E.D., is an adult individual who was a resident at the Berks County Residential Center-Immigration Family Center (BCRC-IFC) at all times relevant to the complaint and is currently residing in Georgia.

6. Defendant United States of America is a defendant under the Federal Tort Claims Act.

## III.  FACTS

7. Plaintiff E.D. entered the United States in or around May 2014, seeking to escape domestic violence and sexual assault.

8. Upon entry, Plaintiff was detained in an immigration facility in Texas for approximately seven (7) days.

9. After approximately a week, Plaintiff was transferred to the BCRC-IFC facility in Leesport, PA.

10. BCRC-ICF has a contract with the United States Immigration and Enforcement ("ICE") agency to hold immigration detainees and their children at BCRC-IFC.

11.     When Plaintiff arrived to BCRC-IFC, Plaintiff was placed in a room with six (6) persons, three (3) of whom were children.

12.     Security personnel made rounds every 10 – 15 minutes at night, and there were three (3) counts per day, at 7:30 a.m., 3:00 p.m. and 8:00 p.m.

13.     There were surveillance cameras in the common areas and the recreation yard, but not in the sleeping areas.

14.     The staff area was in the center of the facility with ten (10) sleeping rooms on each side of the staff area.

15.     The facility housed approximately ninety (90) women and children.

16.     Shortly after Plaintiff's arrival, she met a security person, Daniel Sharkey.

17.     Daniel Sharkey was an employee of the BCRC-IFC facility at all times relevant to the complaint.

18.     Approximately a month after Plaintiff met Sharkey, he attempted to befriend Plaintiff and gave Plaintiff and her son treats such as chocolate and extra portions of food.

19.     Sharkey continued the process of "grooming" by bestowing favors upon Plaintiff, including use of his cell phone, which she used to call her mother and to take pictures, use of the internet, and gifts of toys and clothes from outside the facility to Plaintiff and her son.

20.     Sharkey also made promises to Plaintiff about helping her with her immigration issues, even promising to help her get released from the immigration detention center.

21.     Other residents and facility staff, including ICE employee Jeremiah Petrey,[2] noticed the attention Plaintiff was receiving.

---

[2] Jeremiah Petrey appears to have been known as "Josh" at BCRC-IFC, but his correct formal name may be "Jeremiah Petrey."

22. Sharkey then began touching Plaintiff, initially touching her on the hand, then kissing her in the laundry room which had no surveillance camera.

23. Sharkey then began touching her breasts and buttocks while they were alone in her or others' sleeping quarters.

24. Plaintiff was upset with the attention but feared retaliation if she protested.

25. Plaintiff refused to touch Sharkey which angered him and he insulted her.

26. On a Sunday afternoon at around 3:00 pm in approximately July, Sharkey followed her into the ladies bathroom and forced her to engage in sexual intercourse with him.

27. Shortly thereafter, he met her in the recreational area and demanded that she follow him into the same bathroom and again forced her to have sexual intercourse.

28. While they were engaging in intercourse, a small girl, approximately 7 years old, entered the bathroom, turned around, ran away and told her mother about what she witnessed.

29. About a week later in August, Plaintiff was in the sleeping quarters of a friend named Patricia, who was not present, and Sharkey again forced her to have sex with him.

30. Patricia returned while they were having sex, and Sharkey told Plaintiff to tell Patricia they were in the bathroom and she should leave, which she did.

31. A few days later, Sharkey approached Plaintiff while she was in the outdoor recreation area and tried to pull her pants down, but she refused to submit because there were children present.

32. After the sexual abuse started, Sharkey told E.D. that if she told anyone of the nature of their relationship that she would be deported back to Honduras.

33. When Plaintiff first entered the facility, she did not receive any information during orientation about sexual abuse, sexual assault, or how to report sexual abuse, sexual

assault or other improper behavior by staff members, nor did she receive this information at any other time.

34. By August 2014, several staff members, including Jeremiah Petrey, were aware of their intimate relationship but failed to take any steps to protect Plaintiff.

35. Because BCRC-IFC is a relatively small facility, federal employees such as Petrey have frequent contact and interaction with Berks County employees.

36. The residents must walk down the same hallway(s) as the ICE and Berks County staff, allowing for ample opportunities for both the ICE and Berks County staff to observe the immigration detainees.

37. Petrey is or was a federal employee working for the Immigration and Customs Enforcement of the U.S. Department of Homeland Security ("DHS").

38. He was stationed at BCRC-IFC, had his only (or primary) office of business there, and worked at the facility every workday.

39. Petrey was a Deportation Officer located at BCRC-IFC, he wore a badge and a shirt or uniform that indicated he was with ICE, and was known as the "law" by the immigration detainees.

40. Petrey was the only, or one of only a few, federal or ICE employees who worked on the premises of BCRC-IFC.

41. Petrey conducted all intake interviews of the immigration detainees when they were admitted to BCRC-IFC, he conducted custody reviews, and interviewed the detainees upon their departure.

42. Any requests for a release by immigration detainees went through Petrey, and Petrey made many or all the arrangements for immigration detainees' release.

43. Petrey had frequent interaction with the immigration detainees, beyond the interactions listed above, and came out from his office every day to the space(s) where the residents lived and were permitted to be.

44. Petrey and Sharkey had overlapping work shifts and were friends.

45. Sharkey also had informed Plaintiff E.D. that he and Petrey were friends.

46. As an ICE employee, Petrey has a duty to, upon a reasonable suspicion that a detainee is at substantial risk of imminent sexual abuse, immediately act to protect the detainee. See 6 C.F.R. 115.62; see also 6 C.F.R. 115.61(a); U.S. ICE Policy No. 11062.2: Sexual Abuse and Assault Prevention and Intervention (SAAPI Directive) at 5.3 (5/22/14).

47. Petrey failed to fulfill his duty in acting to protect E.D. from sexual abuse by Daniel Sharkey despite ample reasons to suspect that such abuse was ongoing, and this caused harm to E.D. in that she suffered from sexual assault by Sharkey.

48. Several residents who witnessed their intimacy complained to the staff about the relationship.

49. The staff launched an investigation prompted by the residents' complaints and Plaintiff was interviewed but denied the sexual assault as she was scared and feared deportation.

50. Plaintiff was not informed, either by BCRC-IFC staff or any ICE or DHS officers that she did not break any state or federal laws, that she would be considered a victim under state and federal laws, or that Sharkey would be the abuser.

51. Sharkey left his employment or was terminated soon after the investigation began.

52. Plaintiff continued to conceal the relationship until she broke down and revealed the relationship to her immigration attorney and/or her immigration attorney's assistant on a Sunday in the fall.

53.	Her immigration attorney and his assistant called and emailed various ICE employees and offices, including the Field Office for which Thomas Decker is the Director, and informed them of the incidents.

54.	Diane Edwards, the director of BCRC-IRF, and BCRC-IRF were notified of the reports and incidents.

55.	ICE officials then took E.D. to the Berks County District Attorney's office where she was interviewed by a detective and an ICE special agent, at which time she told the truth about the incidents.

56.	ICE policies and standards, along with federal law, prohibit sexual abuse and sexual assault of immigration detainees by staff and define any sexual contact between staff and detainees, whether consensual or not, as sexual abuse.

57.	DHS introduced Prison Rape Elimination Act ("PREA") standards in March 2014 that would go into effect for immigration detention facilities in May 2014.

58.	ICE standards require that the Field Office Director be notified anytime an employee, contractor, or volunteer is alleged to be a perpetrator of resident sexual abuse or assault.

59.	Thomas Decker, as ICE Field Director, had a duty under Department of Homeland Security regulations, to place E.D. in a supportive environment with the least restrictive housing option available. See 6 C.F.R. 115.68(a).

60.	Thomas Decker failed to meet this duty as Plaintiff was kept at BCRC-IFC in a situation that was not supportive, and in fact, exacerbated her pain and suffering.

61. After E.D. reported the incidents through her attorney, Berks County staff began denying Plaintiff and her son privileges, such as denying a request for a haircut for Plaintiff's son, even though other children were permitted haircuts.

62. In or around November 2014, BCRC-IFC and Diane Edwards began prohibiting women residents from wearing any tight clothing, clothing that revealed any cleavage or skirts and dresses

63. The other BCRC-IFC residents blamed Plaintiff for this policy and isolated her.

64. In or around November 2014, BCRC-IFC and staff, under the direction of Diane Edwards, took many of the women's and girls' clothing, placed them in garbage bags, and gave the residents other clothing that they claimed was more appropriate.

65. DHS and/or ICE has a duty to employ multiple protection measures in order to ensure that detainees are not retaliated against from reporting sexual abuse or for cooperating with investigations.  See 6 C.F.R. 115.67(b).

66. DHS and/or ICE also has an ongoing duty, for at least 90 days following a report of sexual abuse, to monitor the facility for anything that may suggest possible retaliation against detainees, and must act promptly to remedy any such retaliation.  See 6 C.F.R. 115.67(c).

67. ICE failed in these duties by providing no protective measures to E.D. for reporting sexual abuse or cooperating with the investigations, and by failing to monitor for retaliation by BCRC-IFC staff and residents.

68. Under ICE policy, Thomas Decker, as Field Officer Director, has a duty to ensure that BCRC-IFC does not punish any detainee for being a victim of, or reporting sexual abuse. See U.S. ICE Policy No. 11062.2: Sexual Abuse and Assault Prevention and Intervention (SAAPI Directive) at 5.8(1)(a)(iii).

69. Thomas Decker failed in this duty for failing to ensure that E.D. was not retaliated against by BCRC-IFC staff and detainees.

70. As Field Office Director, Thomas Decker makes the final decision on all immigration detainee parole requests, pursuant to Section 7.3(4) of ICE Directive 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.

71. In late October 2014, E.D. made a formal request to the ICE Field Office for immediate parole in large part due to the above-related incidents, but Thomas Decker denied parole.

72. In December 2014, E.D. made another formal request to the ICE Field Office for immediate parole, but Thomas Decker denied parole.

73. Plaintiff was eventually released from the facility in December on an Order of Supervision, and moved to Georgia.

74. Sharkey was later arrested and convicted of Institutional Sexual Assault against Plaintiff.

75. The ICE Residential Standards require residential facilities holding immigration detainees to affirmatively act to prevent sexual abuse and sexual assault of the residents, including the provision of staff training and prompt and effective intervention.

76. ICE policy provides that Thomas Decker, as the Field Office Director, has the duty of ensuring that all of the staff at detention facilities in his area of responsibility are aware of the obligation to report allegations of sexual abuse and assault to ICE. See U.S. ICE Policy No. 11062.2: Sexual Abuse and Assault Prevention and Intervention (SAAPI Directive) at 5.5.

77. Thomas Decker failed to ensure that these standards were properly met at BCRC-IFC.

78. ICE, in combination with BCRC-IFC, has a duty to consider how a video monitoring system will enhance the ability of the facility to protect detainees from sexual abuse, when installing or updating the surveillance system. See 6 C.F.R. 115.18(b).

79. ICE failed to meet this duty by allowing for several "blind spots" (areas not covered by cameras) throughout the facility, including the laundry room, the bathroom, and in a bedroom—areas in which E.D. was sexually abused.

80. Federal regulations mandate that DHS/ICE shall have a written policy mandating zero tolerance toward all forms of sexual abuse and outlining the agency's approach to preventing, detecting, and responding to such conduct. See 6 C.F.R. 115.11(a).

81. Each immigration detention facility must also have a written policy mandating zero tolerance toward all forms of sexual abuse and outlining the facility's approach to preventing, detecting, and responding to such conduct, which must be reviewed and approved by DHS/ICE. See 6 C.F.R. 115.11(c).

82. Each immigration detention facility must employ or designate a Prevention of Sexual Assault Compliance Manager (PSA Compliance Manager) who has sufficient time and authority to oversee facility efforts to comply with facility sexual abuse prevention and intervention policies and procedures, see 6 C.F.R. 115.11(d), and neither BCRC-IFC nor DHS/ICE properly complied with this regulation, as they did not designate an individual to ensure compliance with PREA aside from possibly the executive director.

83. DHS/ICE and BCRC-IFC are required to take steps to ensure meaningful access by immigration detainees to all efforts to prevent, detect, and respond to sexual abuse to detainees with limited English skills, see C.F.R. 115.16(b), but failed to do so as Plaintiff was initially frightened to report what had happened.

84. DHS/ICE failed to ensure the establishment and/or implementation of these policies, procedures and practices that would protect immigration detainees from sexual abuse and sexual assault, including but not limited to an effective reporting system and investigative procedure relating to sexual abuse and sexual assault; the provision of information on how to report sexual abuse and sexual assault and to notify residents that any reports would not jeopardize their immigration status; and the failure to inform residents of policies or give them information regarding sexual abuse and sexual harassment.

85. At all times relevant to the complaint, Decker and Petrey were acting in the course and scope of employment.

86. Plaintiff has experienced pain, suffering, and depression due to the incidents.

## IV.   CAUSES OF ACTION

### COUNT I

**Federal Tort Claims Act – Negligence**
**Plaintiff v. Defendant United States of America**

87. Plaintiff incorporates by reference paragraphs 1 – 86, as if fully set forth in this paragraph.

88. The Department of Homeland Security ("DHS") and/or U.S. Immigration and Customs Enforcement ("ICE"), along with federal employees Thomas Decker and Jeremiah Petrey, owed a duty to Plaintiff E.D., breached their duty to her, and these breaches of duty were a direct and proximate cause and a substantial factor causing harm to E.D.

89. The actions of DHS, ICE, and federal employees constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

90.     Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

## V.    RELIEF REQUESTED

1. Compensatory damages against Defendant;

2. Reasonable attorneys' fees and costs; and

3. Any other relief the Court deems necessary.

Respectfully submitted,

_/s/ Su Ming Yeh_
Su Ming Yeh
Attorney # PA 95111
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966

/s/ Angus R. Love
Angus R. Love
Attorney # PA 22392
Pennsylvania Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966

DATE: June 15, 2017